# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

MIRANDA POLK,

     Plaintiff,

v.                                  Case No. 3:20-cv-549-MMH-LLL

GENERAL MOTORS LLC,

     Defendant.

_____

# O R D E R

**THIS CAUSE** is before the Court on Defendant's Motion for Final Summary Judgment and Spoliation Sanctions and Incorporated Memorandum of Law (Doc. 69; Motion for Summary Judgment) filed by General Motors LLC ("GM") on July 21, 2023. Plaintiff Miranda Polk timely filed a response on August 18, 2023. See Plaintiff's Response to Defendant's Motion for Final Summary Judgment and Spoliation Sanctions (Doc. 76; Response to Motion for Summary Judgment). GM then filed a reply. See General Motors LLC's Reply in Support of its Motion for Final Summary Judgment and Spoliation Sanctions (Doc. 80; Reply) filed August 29, 2023. Also before the Court is Defendant's Supplemental Motion to Exclude Testimony of Byron Bloch and Incorporated Memorandum of Law (Doc. 73; Motion to Exclude) filed by GM on July 28, 2023. Plaintiff timely responded on August 18, 2023. See Plaintiff's Memorandum in

Opposition to General Motors LLC's Supplemental Motion to Exclude Testimony of Byron Bloch (Doc. 78; Response to Motion to Exclude). Accordingly, both motions are ripe for review.

## I.   Background[1]

On June 18, 2016, Miranda Polk, Zachary Colley, and Trey Barone were traveling southbound on Florida State Road 207 in St. John's County, Florida, in a 2008 Chevrolet Silverado pickup truck (the "Silverado"). See Deposition of Miranda Polk at 38–41(Doc. 69-2; Polk Deposition).[2] Colley was driving the Silverado, which he owned, and Polk was seated in the middle of the truck's passenger seat bench. See Deposition of Zachary Colley at 6–7 (Doc. 76-1; Colley Deposition).[3] The three were returning from the movies when Colley, for an unknown reason, suddenly swerved and lost control of the Silverado. Polk Deposition at 45. He attempted to regain control of the vehicle, but over-corrected, causing the Silverado to roll over approximately three times. Id. at

---

[1] Unless otherwise noted, the facts recited here are undisputed. For the purposes of resolving the Motion for Summary Judgment, the Court views all disputed facts and reasonable inferences in the light most favorable to the Plaintiff, Miranda Polk. However, the Court notes that these facts may differ from those ultimately proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

[2] In her Amended Complaint, Polk states that the accident occurred on June 16, 2016. See Amended Complaint at 1 (Doc. 3). However, both parties agree that the accident actually occurred on June 18, 2016. Motion for Summary Judgment at 3 fn.1; Response to Motion for Summary Judgment at 2.

[3] The record contains different spellings of "Zachary Colley's" name. For consistency, the Court will use the spelling used in his deposition. Colley Deposition at 1.

43. Colley and Barone were not wearing their seatbelts, and were ejected during the rollover. Id. at 38. Polk also was not wearing her seatbelt, but remained in the vehicle, and became trapped in the Silverado when its roof "match-boxed." Id. at 51.[4] Below is an image taken after the accident depicting this match-boxing:



See Response to Motion for Summary Judgment at Ex. E.

St. Johns County Fire Rescue arrived on the scene of the accident and found Polk pinned in the fetal position in the Silverado. See Deposition of Matt Barr at 39 (Doc. 76-8; Barr Deposition). Fire Rescue was able to extricate Polk

---

[4] "Match-boxing occurs when the roof pillars that support the roof collapse by bending at weak points and where they attach to the body of the vehicle. The A-pillar collapses laterally and the roof crushes downward on top of the vehicle's occupant(s)." Response to Motion for Summary Judgment at 8.

by cutting the A pillar and B pillar of the Silverado's roof. Id. at 37. But as a result of the accident, Polk sustained a severe spinal cord injury that resulted in paraplegia. Polk Deposition at 21.

Following the accident, the Silverado was taken to Copart in Jacksonville, Florida, where it was in the possession and control of Copart and State Farm Mutual Automobile Insurance Company (State Farm). See Copart's Response to GM's Subpoena Duces Tecum at 30 (Doc. 69-7; Copart's Response). Before Polk commenced this litigation, her attorneys requested that Copart allow them to inspect the Silverado. Id. at 22. Copart granted this request, and on September 29, 2016, Polk's expert witness, Dr. Richard Boehme, conducted an inspection of the Silverado. Id. at 37. During this inspection, Dr. Boehme took measurements and photographs of the vehicle. See Deposition of Richard Boehme at 16 (69-3; Boehme Deposition). Shortly after, in January of 2017, Chris Yates, another expert retained by Polk, also conducted an inspection of the Silverado. See Deposition of Chris Yates at 27 (Doc. 69-5; Yates Deposition). During this inspection, Yates took photos and measurements of the Silverado and downloaded data from the vehicle's Sensing Diagnostic Module ("SDM"). Id. at 28–29. The SDM contained data such as the speed of the Silverado prior to the accident, changes in the vehicle's velocity during the accident, the roll rate, and other technical information. Id. at 30–31. On December 24, 2021, Polk filed a motion asking the Court to allow her to substitute Byron Bloch for Yates

as an expert, which the Court granted. <u>See</u> Order Granting Plaintiff's Motion to Substitute Expert Witness at 7 (Doc. 55). Subsequently, Polk's attorneys authorized Yates and his firm, BEC Consulting, to close their case file. <u>See</u> BEC Consulting's Response to GM's Subpoena Duces Tecum at 2 (Doc. 69-8). As a result, BEC Consulting destroyed all of the evidence that Yates and BEC Consulting had in their possession. <u>Id.</u>

Shortly after the accident, Polk's attorneys notified State Farm and Copart that the Silverado should be "retained indefinitely." <u>See</u> Request for Hold at 2 (Doc. 69-12). However, unbeknownst to Polk, a State Farm employee released the preservation hold on the Silverado. Copart's Response at 21; Response to Motion for Summary Judgment at 4. As a result, in July of 2017, Copart sold the Silverado to a third-party in the country of Jordan before GM had a chance to inspect it. Copart's Response at 17.

On May 12, 2020, Polk initiated this action against GM in the Circuit Court in and for Columbia County, Florida. <u>See</u> Notice of Removal at 1 (Doc. 1). GM timely removed the action to this Court. <u>Id.</u> Polk asserts two claims against GM for (1) product liability and (2) negligence, alleging that GM defectively designed the Silverado and the defective design was the cause of her injuries. <u>See</u> Amended Complaint at 3–5 (Doc. 3).

## II.    Legal Standards

### A.    Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[5] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting

---

[5] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding; they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; see also McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case."). In determining whether summary judgment is appropriate, a court "must view all

evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

### B.   Exclusion of Expert Testimony

Rule 702 of the Federal Rules of Evidence (Evidence Rule(s)) provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Evidence Rule 702.[6] In <u>Daubert</u>, the Supreme Court explained that Evidence

---

[6] The language of Evidence Rule 702 was amended in December 2011 and December 2023. The Advisory Committee Notes accompanying the 2011 revision state that the changes are only stylistic and do not make any substantive change. Evidence Rule 702 advisory committee's note (2011 amends.). Thus, case law interpreting and applying Evidence Rule 702 prior to 2011 is still applicable. In the 2023 amendments the Committee clarified "that the preponderance [of the evidence] standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." Evidence Rule 702 advisory committee's notes (2023 amends.). The Court applies Rule 702 as amended because the amendments do not substantively change the Rule, ("[n]othing in the amendment imposes any new, specific procedures"), and because it is "just and practicable" to do so. <u>Id.</u>; Order of the Supreme Court of the United States, April 24, 2023, https://www.supremecourt.gov/orders/courtorders/frev2 3_5468.pdf.

Rule 702 imposes an obligation on a trial court to act as gatekeeper, to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 589 (1993). The trial court must exercise "the same gatekeeping function" when "considering the admissibility of <u>technical</u> expert evidence." <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). To determine the admissibility of expert testimony, a trial court must consider if:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Id.</u> The burden of establishing qualification, reliability, and helpfulness lies with the party offering the expert opinion. <u>See</u> <u>McClain v. Metabolife Int'l, Inc.</u> 401 F.3d 1233, 1238 (11th Cir. 2005).

For the purpose of conducting the reliability inquiry mandated by <u>Daubert</u>, the Supreme Court has suggested that a trial court consider a number of factors, which include: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant scientific community. <u>See Daubert</u>, 509 U.S. at 593–94. These factors are not exhaustive,

and the Eleventh Circuit Court of Appeals has also considered whether an expert has relied on anecdotal evidence, such as case reports; temporal proximity; and improper extrapolation. See Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999). When evaluating non-scientific, experience-based testimony, the Eleventh Circuit recognizes that "[s]ometimes the specific Daubert factors will aid in determining reliability; sometimes other questions may be more useful." Frazier, 387 F.3d at 1262. Indeed, while a trial court must always evaluate the reliability of expert testimony before allowing its admission at trial, "[e]xactly how reliability is evaluated may vary from case to case." Id. Significantly, where an expert relies solely or primarily on experience to establish the reliability of his opinion, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Id. at 1261, 1265 (quoting Evidence Rule 702 advisory committee's note (2000 amends.)). To fulfill its gatekeeping function, the Court must do more than "simply tak[e] the expert's word for it." Id. at 1262 (quoting Evidence Rule 702 advisory committee's note (2000 amends.)). The Court's inquiry under Evidence Rule 702 must focus on the methodology, not conclusions, but the Court is not required to admit opinion testimony only connected to existing data by an expert's unsupported assertion. See Daubert, 509 U.S. at 595; Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

The proponent of expert testimony need not show that the opinion proffered is scientifically correct, but only, based upon a preponderance of the evidence, that the opinion is reliable. See Allison, 184 F.3d at 1312. Thus, absolute certainty is not required. See Jones v. Otis Elevator Co., 861 F.2d 655, 662 (11th Cir. 1988). However, an expert must know "facts which enable him to express a reasonably accurate conclusion instead of mere conjecture or speculation," id., and an expert's assurances that he has used generally accepted scientific methodology are insufficient. McClain, 401 F.3d at 1244.

In addition to determining the reliability of the proposed testimony, Daubert instructs that Evidence Rule 702 requires the Court to determine whether the evidence or testimony assists the trier of fact in understanding the evidence or determining a fact in issue. See Daubert 509 U.S. at 591. This consideration focuses on the relevance of the proffered expert testimony or evidence. The Court explained that to satisfy this relevance requirement, the expert testimony must be "relevant to the task at hand." Id. Because scientific testimony does not assist the trier of fact unless it has a justified scientific relation to the facts, the Eleventh Circuit has opined that "there is no fit where a large analytical leap must be made between the facts and the opinion." McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing Joiner, 522 U.S. at 143–46) (finding too great an analytical gap between data suggesting that one type of cancer was caused in mice and the conclusion or opinion that

such data established causation of another type of cancer in humans)). Expert testimony also must "concern[] matters that are beyond the understanding of the average lay person." <u>Frazier</u>, 387 F.3d at 1262. The Eleventh Circuit has instructed that "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." <u>Id.</u> at 1262–63.

## III.  Discussion

In the Motion for Summary Judgment, GM argues that it is entitled to summary judgment because Polk cannot show that the Silverado was defective or that the purported defect caused her injuries. Motion for Summary Judgment at 9. In the alternative, GM contends that it is entitled to an entry of final judgment due to Polk's spoliation of evidence. <u>Id.</u> at 14. Polk contends that GM's arguments are meritless, and that its request for summary judgment and spoliation sanctions should be denied. Response to Motion for Summary Judgment at 13, 22. In the Motion to Exclude, GM asserts that Polk's expert witness, Bloch, should be excluded under Federal Rules of Evidence 702 and 703. Motion to Exclude at 1. Polk disagrees, arguing that exclusion of Bloch's testimony is unwarranted. Response to Motion to Exclude at 2.

For the reasons discussed below, the Court finds that GM's Motion for Summary Judgment is due to be granted in-part, denied in-part, and taken under advisement in-part. GM's Motion to Exclude is also due to be granted in-

part and denied in-part. The Court first addresses GM's Motion to Exclude, as it is dispositive of portions of the Motion for Summary Judgment.

### A.    Motion to Exclude

GM contends that the opinions of Polk's expert witness, Bloch, should be excluded under Federal Rules of Evidence 702 and 703 because Bloch is not qualified to testify as to some matters, his methodology is unreliable, and his testimony will not aid the jury. Motion to Exclude at 11. Before addressing the merits of GM's arguments, the Court summarizes Bloch's background and his opinions.

Polk offers Bloch as an expert in "Automotive Safety Design and Vehicle Crashworthiness." Background of Byron Bloch at 1 (Doc. 78-1; Bloch Resume). Her attorneys asked him to determine "whether the 2008 Chevrolet Silverado pickup truck involved in the June 18, 2016 accident was defectively designed." Response to Motion to Exclude at 9. As to Bloch's qualifications in this area, he has a degree in industrial design; has been published and given presentations on vehicle safety topics over forty-five times; is a member of numerous professional organizations relating to automobile safety; has testified before governmental boards regarding proposals to enhance vehicle safety; and has been practicing in the field of automotive design and safety for over 40 years. Bloch Resume at 5–10. Bloch's opinions in this case can be separated into three categories: first, that the Silverado's roof was defectively designed so as to be

susceptible to match-boxing; second, that alternative designs for the Silverado were feasible; and third, that these alternative designs, if implemented, would have prevented Polk's injuries. See generally Expert Report on Defective Design and Unsafe Performance of the 2008 Chevrolet Silverado 1500 Pickup Truck Roof Structure (Doc. 78-4; Bloch Expert Report).[7]

In the first opinion of his expert report, Bloch describes seven design defects that he found to be present in the Silverado:

> 1) The Rear Window Header has open-section and large hole cut-out.
> 2.) Roof Crossmembers are lacking, thus no lateral strengthening.
> 3.) As to the B-Pillar: No internal reinforcement and large hole cut-out.
> 4.) Roof Siderail: Many hole cut-outs weaken support strength.
> 5.) Windshield Pillar: No reinforcing brace at top or bottom.
> 6.) Corner Juncture: No reinforcement.
> 7.) Windshield Header: Minimal box-section with weak areas that allow buckling.

Id. at 1; Response to Motion to Exclude at 5. In determining that these defects were present, Bloch considered numerous pieces of evidence and data. First, Bloch obtained an exemplar of the Silverado's roof, examined its structure and design, and compared it to the images taken from the accident. Bloch Expert

---

[7] Bloch has submitted three supplements to his expert report: (1) Addendum to GM Rollover Test and Roof Structure Performance and GM's Failure to Conduct FEMA Evaluation and Upgrades (Doc. 73-6; First Supplement to Expert Report); (2) Addendum Supplement of Instrumented Dummy Data of GM Rollover Test and Roof Structure Performance, and GM's Failure to Notify NHTSA and Conduct a Recall and Remedy Campaign per Federal law (Doc. 73-7; Second Supplement to Expert Report); and (3) Silverado's Roof Crush During Rollover Caused Miranda's Injury (Doc. 73-8; Third Supplement to Expert Report).

Report at 9. Bloch performed this examination with the purpose of analyzing "the roof's structural design, and to correlate how the Chevy Silverado's roof buckled and deformed and crushed down in the subject rollover accident." Id. Bloch then analyzed the Silverado's strength-to-weight ratio, which GM states is 1.5 or 2, and used data from the National Highway Traffic Safety Administration (NHTSA) to determine how this ratio compares to other similar vehicles. Id. at 14. Based upon this comparison, Bloch concluded that the Silverado's strength-to-weight ratio of 1.5 or 2.0 was below the industry average:

> 2006 VW Jetta .....................SWR of 5.1
> 2007 Scion SC ......................SWR of 4.6
> 2006 Volvo XC90 .................SWR of 4.6
> 2007 Toyota Tacoma ............SWR of 4.4
> 2006 Mazda 5 .......................SWR of 4.4
> 2007 Toyota Camry...............SWR of 4.3
> 2007 Ford F-150 .................SWR of 2.3
> 2004 Chevrolet 2500 HD.....SWR of 2.3
> 2007 Chevrolet Tahoe ..........SWR of 2.1
> 2006 Dodge Ram .................SWR of 1.7
> 2003 Ford F-250 ..................SWR of 1.7

Id. at 15; see also Federal Register, Vol. 74, 22348, 22392 app. C (May 12, 2009).

Bloch also reviewed test #Bl050474, a simulated rollover test conducted by GM on a truck similar to the Silverado. First Supplement to Expert Report at 1. According to Bloch, this test highlighted "the poor performance of the GMT-900 Silverado roof[,]" and showed how it is susceptible to match-boxing

during rollover accidents. <u>See</u> Affidavit of Byron Bloch at 9 (Doc. 78-2; Bloch Affidavit).[8] Bloch then compared the results of this test with Polk's accident, and concluded that the Silverado match-boxed "similarly to the buckling and deformation seen in the [test] vehicle[.]" <u>Id.</u> Taking into account all of the above, Bloch arrived at his opinion that "the 2008 Chevy Silverado at-issue was defectively designed and unreasonably dangerous and unsafe[.]" Bloch Expert Report at 1.

As to Bloch's opinion regarding alternative designs for the Silverado, he concluded that GM could have implemented seven alternative designs that would have strengthened the Silverado's roof:

1.) As to the Rear Window Header: a Box-section with reinforcement.
2.) As to the Roof Crossmembers: a Box-section crossmember to prevent lateral match boxing.
3.) As to the Mid-Body B-Pillar: an Internal baffle reinforcement.
4.) As to the Roof Siderail: a more robust box-section, minimize any holes, and add internal baffle.

---

[8] GM contends that the Bloch Affidavit is a sham, and that it should be stricken from the record. Reply at 5–6 n.2. According to GM, Bloch's affidavit should be stricken because it conflicts with his deposition testimony. <u>Id.</u> GM explains that in this affidavit Bloch states that "he relied heavily on a NHTSA research note showing various vehicle's strength-to-weight ratios." <u>Id.</u> But, GM contends these studies were never disclosed in Bloch's expert report or deposition. <u>Id.</u> The Court finds this argument to be unavailing. Bloch discusses the NHTSA and its research numerous times throughout his expert report. <u>See</u> Bloch Expert Report at 7, 15, 16, 18. Moreover, the NHTSA data that Bloch refers to in his affidavit does not appear to contradict his expert report or his deposition testimony. Outside of the NHTSA reports, GM argues that there are other numerous contradictions between Bloch's statements in the Bloch Affidavit and his expert report and deposition. Reply at 5–6 n.2. However, GM does not identify what these contradictions are. On this record, the Court finds no basis to strike the Bloch Affidavit as a sham. Regardless, although the Court does refer to the Bloch Affidavit in its analysis of GM's Motion for Summary Judgment and Motion to Exclude, the Court does not find the content of the Affidavit to be dispositive as to either of these motions.

5.) As to the Windshield Pillar: add Gusset braces at top and bottom.
6.) As to the Corner Juncture: add a Reinforcement gusset plate.
7.) As to the Windshield Header: a more robust continuous boxsection.

Id. at 13; Response to Motion to Exclude at 5–6. In determining that these alternative designs were feasible, Bloch analyzed vehicle reference books from Ford, Chrysler, GM, and Opal to compare the designs that these manufacturers were using at the time GM was designing the Silverado. Bloch Affidavit at 6. Bloch then used the data from the NHTSA regarding vehicle strength-to-weight ratios to conclude that other manufacturers were designing vehicles with stronger roofs than the Silverado. Bloch Expert Report at 15. Bloch opines that "Toyota has demonstrated that it's feasible to have a pickup truck with a [strength-to-weight ratio] above 4.4[.]" Id. And that therefore, "stronger roof designs (SWR at 5-plus) would have been easily accomplished for the 2007-thru-2014 GMT 900 Chevy Silverado at-issue" in this case. Id.

With regard to the efficacy of these alternative designs, Bloch opines that they would have prevented Polk's injuries. Notably, Bloch did not conduct any tests to support this conclusion. Instead, Bloch relied upon research conducted by the NHTSA. Specifically, Bloch analyzed a peer reviewed study, known as the "Obergefell Tests," which documents a series of dynamic tests conducted by the NHTSA to investigate vehicle and occupant dynamics during rollover events. Bloch Affidavit at 11. This study used data from simulated rollovers to

"correlate[] the extent of roof crush with the X/Y/Z-axis loads (and injury risk) onto the instrumented dummies." Id. Using the Obergefell Test's findings, Bloch opines that "if you reduce the extent of roof deformation or roof crush, you reduce the forces experienced by the lumbar spine whether it's a test dummy or whether it's Miranda Polk." See Deposition of Byron Bloch at 160 (Doc. 73-9; Bloch Deposition). Bloch also analyzed research and testing conducted by the NHTSA which shows a "statistically significant relationship between the peak strength-to-weight ratio (SWR) obtained through laboratory roof strength testing and the maximum vertical roof intrusion in real world rollovers[.]" Bloch Affidavit at 12 (quotation omitted). And he used these reports to conclude that if the Silverado had a greater strength-to-weight ratio its roof would not have match-boxed in on Polk. Bloch Expert Report at 31. Ultimately, Bloch opines that had just two of his proposed alternative designs been implemented, Polk would not have been injured during the accident. Bloch Deposition at 157.

As noted above, GM argues that Bloch is not qualified to offer some of his opinions, his methodology in reaching his opinions is unreliable, and his testimony will not be helpful to the jury. The Court addresses each argument below.

### 1.    Bloch's Qualifications

Polk offers Bloch as an expert in "Automotive Safety Design and Vehicle Crashworthiness." Resume of Byron Bloch at 1. He is asked to offer an opinion

as to "whether the 2008 Chevrolet Silverado pickup truck . . . was defectively designed." Response to Motion to Exclude at 9. GM does not contest that Bloch is qualified to offer an opinion on this issue. Nonetheless, the Court independently considers his qualifications and concludes that Bloch has sufficient knowledge, experience, and training in the field of automotive design and safety so as to be qualified as an expert on this subject. Specifically, Bloch has been practicing in the area of automotive design and safety for over 40 years, he has written numerous articles on this topic, and he has an educational background in industrial design. Bloch Resume at 2–8. Under <u>Daubert</u>, "so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." <u>Kilpatrick v. Breg, Inc.</u>, No. 08-10052-CIV, 2009 WL 2058384, at *3 (S.D. Fla. June 25, 2009) (quotation omitted) (alterations in original)).[9] As GM does not object to Bloch's qualifications on the subject of automotive design and safety—and because Bloch is at least minimally qualified to offer an opinion on this subject—the Court finds that Bloch is qualified to offer his opinion as to whether the Silverado was defectively designed.

---

[9] The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority. <u>See</u> <u>Stone v. First Union Corp.</u>, 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects").

GM does, however, argue that Bloch is unqualified to opine as to medical causation and biomechanics. Motion to Exclude at 20. Specifically, GM contends that "Mr. Bloch is not a doctor and is not an engineer." Id. And therefore, he "is wholly unqualified under Rule 702 to offer opinions on" these subjects. Id. Notably, Polk has not addressed GM's arguments as to this issue, nor has she proffered any evidence that Bloch is in-fact qualified to testify about these subjects. This proves fatal, as the "proponent of expert testimony always bears the burden to show that [her] expert is qualified to testify competently regarding the matters he intend[s] to address[.]" Frazier, 387 F.3d at 1260 (quoting McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002) (alterations and quotations omitted)). As Polk has failed to provide any evidence that Bloch is qualified to testify about medical causation and biomechanics, the Court will prohibit Bloch from testifying at trial regarding these subjects.

## 2.    Bloch's Methodology

As noted previously, Bloch has offered three separate categories of opinions in this case. First, that the Silverado's roof was defectively designed so as to be susceptible to match-boxing. Second, that alternative designs for the Silverado were feasible. And third, that these alternative designs would have

prevented Polk's injuries. <u>See generally</u> Bloch Expert Report.[10] GM contends

that Bloch's methodology in reaching each of these three opinions is unreliable,

and that he should therefore be prohibited from offering his opinions. Motion to

Exclude at 11–15. Pursuant to Rule 702(c), an expert's testimony must be "the

product of reliable principles and methods." <u>Id.</u> "Presenting a summary of a

proffered expert's testimony in the form of conclusory statements devoid of

factual or analytical support is simply not enough." <u>Cook ex rel. Est. of Tessier</u>

<u>v. Sheriff of Monroe Cnty., Fla.</u>, 402 F.3d 1092, 1113 (11th Cir. 2005). Instead,

the Court must determine "whether the reasoning or methodology underlying

the testimony is scientifically valid and . . . whether that reasoning or

methodology properly can be applied to the facts in issue." <u>Daubert</u>, 509 U.S. at

592–93. In making this determination, the Eleventh Circuit has identified four

factors that a court may weigh:

> (1) [W]hether the expert's methodology has been tested or is capable
> of being tested; (2) whether the technique has been subjected to
> peer review and publication; (3) the known and potential error rate
> of the methodology; and (4) whether the technique has been
> generally accepted in the proper scientific community.

<u>McDowell v. Brown</u>, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing <u>Daubert</u>, 509

U.S. at 593–94)). "This list is not exhaustive[,]" and "the district court may take

---

[10] Bloch's opinion that his proposed alternative designs would have prevented Polk's injuries necessarily involves questions of medical causation and biomechanics. As the Court has already found that Bloch is unqualified to render such opinions, he is foreclosed from opining on this subject at trial. However, out of an abundance of caution, the Court will analyze whether Bloch used a sufficiently reliable methodology in reaching this opinion.

other relevant factors into account." <u>Seamon v. Remington Arms Co., LLC</u>, 813 F.3d 983, 988 (11th Cir. 2016). Consequently, the Court has "substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable." <u>United States v. Majors</u>, 196 F.3d 1206, 1215 (11th Cir. 1999) (quotation omitted). The Court will address the reliability of Bloch's opinion on each of the three subjects in turn.

a. <u>Bloch's Methodology in Determining that the Silverado's Roof was Defectively Designed</u>

GM argues that Bloch's methodology for determining that the Silverado's roof was defectively designed is unreliable. Motion to Exclude at 15. To reach his opinion on the subject of design defect, Bloch obtained an exemplar of the Silverado's roof and analyzed it to determine whether any discernable defects were present. Based upon his examination, Bloch concluded that the Silverado's roof had seven defects, all of which related to deficiencies with the strength and structure of the roof. Bloch then used the data from the NHTSA to compare the Silverado's strength-to-weight ratio to that of other vehicles manufactured at the time, and concluded that the Silverado was at the lower end of the industry average. Bloch then considered the research conducted by the NHTSA which shows that a vehicle's strength-to-weight ratio correlates with the amount of roof deformation that occurs during rollover events. And he used these findings to support his conclusion that the Silverado's lower

strength-to-weight ratio made it more susceptible to match-boxing. This finding, according to Bloch, was further corroborated by test #B1050474 which showed that GM's trucks have a propensity to match-box during rollover events. Taking into account all of these facts, Bloch concluded that the Silverado was defectively designed.

GM contends that this methodology is unreliable because Bloch did not inspect the vehicle, perform any accident reconstruction, or conduct any case-specific testing to support his findings. Motion to Exclude at 16. The Court finds these arguments to be unavailing. While it is true that Bloch did not examine the roof of the Silverado, Bloch did obtain an exemplar of the Silverado to "examine details of the roof's structural design, and to correlate how the Chevy Silverado's roof buckled and deformed and crushed down in the subject rollover accident." Bloch Expert Report at 9. It was based upon his examination of the exemplar that Bloch identified the seven different defects that he found to be present. Id. at 13. Although GM contends that Bloch should have examined the roof of the Silverado at issue in this case, an expert "need not have inspected the car himself for him to determine that the car had a defect." Rosen v. J.M. Auto Inc., No. 07-61234-CIV, 2009 WL 10667559, at *4 (S.D. Fla. Apr. 2, 2009) (citation omitted). In the Court's view, GM's argument regarding the sufficiency of Bloch's examination of an exemplar of the Silverado, versus having examined the roof of the Silverado at issue in this case, goes to the weight of his testimony

and not its admissibility. As such, GM's challenges to Bloch's methodology based on his failure to inspect the vehicle are best addressed on cross-examination.

As to GM's contention that Bloch's methodology is unreliable because he did not reconstruct the accident, the Court finds that this does not bear on Bloch's ability to testify as to whether the Silverado was defective. In product liability cases it is not uncommon for a party to obtain both a defect expert and an accident reconstruction expert. See Rockhill-Anderson v. Deere & Co., 994 F. Supp. 2d 1224, 1230 (M.D. Ala. 2014) ("[T]he parties have both employed a design expert and an accident reconstruction expert."). This makes sense, as these are generally two different fields of expertise. See Quashen v. Carnival Corp., No. 1:20-CV-22299-KMM, 2022 WL 1271982, at *9 (S.D. Fla. Jan. 6, 2022) (discussing the difference between an expert's experience that "relates to the investigation of engineering-related aspects of accidents, [versus] the reconstruction of a sequence of events underlying an accident, as would an accident reconstruction expert")). Accordingly, the Court does not find that Bloch's failure to reconstruct the accident affects his ability to opine as to whether the Silverado was defective. Nor does it undermine the reliability of the methodology he used to reach his opinion on that issue.

As to GM's argument that Bloch's methodology is unreliable because he did not conduct any case specific testing, the Court finds that this objection goes

to the weight of Bloch's testimony, and not its admissibility. Generally, "[p]hysical testing is not an absolute prerequisite to the admission of expert testimony." Hendrix v. Evenflo Co., 255 F.R.D. 568, 586 (N.D. Fla. 2009) (citing Cummins v. Lyle Indus., 93 F.3d 362, 369 (7th Cir. 1996)). Nevertheless, while "testing is not always a prerequisite to reliability, an expert who conducts no testing must be prepared with a good explanation as to why his or her conclusion remain[s] reliable notwithstanding the absence of testing." Id. at 588 (quotation omitted). Here, Bloch did not conduct any tests himself, but he did rely on the results from test #B1050474. In test #B1050474, GM conducted a simulated rollover using a truck similar to the Silverado. Bloch reviewed the results from this test, and concluded that the Silverado match-boxed "similarly to the buckling and deformation seen in the [test] vehicle[.]" Bloch Affidavit at 9. According to Bloch, having conducted this test, GM was aware that its trucks were susceptible to match-boxing during rollover accidents. First Supplement to Expert Report at 8. Although it may have been helpful for Bloch to conduct his own testing, the failure to do so does not render his methodology unreliable. Instead, Bloch's reliance upon test #B1050474, versus conducting his own test, goes to the weight of his testimony and not its admissibility. See Rebotix Repair, LLC v. Intuitive Surgical, Inc., No. 8:20-CV-2274-VMC-TGW, 2022 WL 3226774, at *4 (M.D. Fla. Aug. 10, 2022) (citation omitted) ("[S]o long as

scientifically valid methods are used, an expert need not precisely replicate real-world conditions and any failure to do so goes to weight, not admissibility.")).

In sum, the Court finds that Bloch used sufficiently reliable methods and principles to analyze the structure and design of the Silverado's roof, used peer reviewed studies conducted by the NHTSA to support his finding that a vehicle's strength-to-weight ratio correlates with it propensity to match-box during rollover events, and relied upon the results from test #B1050474 to conclude that GM's vehicles were susceptible to match-boxing. Taking into account all of these facts, the Court finds that Bloch's methodology for forming his opinion that the Silverado was defective is sufficiently reliable under Rule 702. As to GM's objections to Bloch's methodology, "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence.'" Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quoting Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311 (11th Cir. 1999) (alterations in original)).

b.  Bloch's Methodology in Determining that Alternative Designs Were Feasible

GM argues that Bloch's methodology for reaching his opinion that alternative designs for the Silverado were feasible is unreliable because he did not "perform testing or other calculations to verify" his proposed alternative design theories. Motion to Exclude at 12 (citation omitted). The Court finds this

argument to be unavailing. Notably, "where the proposed alternative design has been produced and put to practical use in the industry, [an] expert does not need to personally test it to satisfy <u>Daubert.</u>" <u>Moncrieffe v. Clark Equip. Co.</u>, No. 06-22644-CIV, 2008 WL 11333222, at *8 (S.D. Fla. July 23, 2008) (citing <u>Hodges v. Mack Trucks Inc.</u>, 474 F.3d 188 (5th Cir. 2006)). Here, although Bloch did not personally test his alternative design theories, he did rely upon designs that had been put to practical use within the automotive industry. Specifically, Bloch analyzed vehicle reference books from Ford, Chrysler, GM, and Opal to determine what designs these manufactures were using at the time GM designed the Silverado. Bloch Affidavit at 6. Bloch also analyzed the strength-to-weight-ratio data compiled by the NHTSA, and used this data to conclude that other vehicle manufacturers were producing vehicles with higher strength-to-weight ratios than the Silverado. Because Bloch reached his opinion that alternative designs for the Silverado were feasible by examining the designs implemented by other manufactures in the automotive industry, the Court finds that his methodology in reaching this opinion is sufficiently reliable. Bloch's failure to conduct any tests therefore goes to the weight of his testimony, and not its admissibility.

c.  <u>Bloch's Methodology as to his Opinion that Alternative Designs Would Have Prevented Polk's Injuries</u>

GM argues that Bloch's opinion that his proposed alternative designs for the Silverado would have prevented Polk's injuries is unreliable because he did not conduct any tests to confirm this theoretical conclusion. Motion to Exclude at 12. The Court finds this argument to be persuasive. Bloch opines that had just two of his proposed alternative designs been implemented, Polk would not have been injured during the accident. Bloch Deposition at 157. Bloch conducted no testing to support this conclusion. Instead, he bases his opinion upon the NHTSA's strength-to-weight ratio data and the results from the Obergefell Test. Neither of these sources are sufficient. As to the NHTSA data, Bloch compared the Silverado's strength-to-weight ratio of 1.5 or 2 to other cars in the industry, and noted that it was below the industry average. Consequently, Bloch is of the opinion that "Toyota has demonstrated that it's feasible to have a pickup truck with a [strength-to-weight ratio] above 4.4" and that therefore "stronger roof designs (SWR at 5-plus) would have been easily accomplished for the 2007-thru-2014 GMT 900 Chevy Silverado at-issue[.]" Bloch Expert Report at 15. While this reasoning supports a conclusion that his alternative design was feasible it does nothing to support Bloch's theory that his proposed alternative designs would have prevented Polk's injuries. Although Toyota produced vehicles with a strength-to-weight ratio above 4.0, other similar cars

in the industry varied from 1.7 to 5.1. Id. at 15. In fact, as Bloch himself states, "[t]he strength to weight ratio (SWR) of vehicle roofs has been documented over the years, and there is great variance." Id.[11] Given the great variance between vehicle manufacturers and the strength-to-weight ratio used in their cars, the Court is left to wonder what specific strength-to-weight ratio would have been strong enough to prevent Polk's injuries. It is possible that a strength-to-weight ratio of 5.0 would not have prevented Polk's injuries, while it is also possible that a strength-to-weight ratio of 3.0 would have sufficed. The Court is left to speculate because Bloch conducted no testing or other analysis to support his opinion. Instead, he supplies the Court with the bare conclusion that a stronger strength-to-weight ratio would have sufficed.[12] This is insufficient. While stronger may have been better, that does not mean a stronger roof would have prevented Polk from being injured.

---

[11] Moreover, at the time of the Silverado's design federal standards enacted by the NHTSA required that vehicles have a minimum strength-to-weight ratio of 1.5. See 49 C.F.R. § 571.216a (S5.2)(b). This is further evidence that a specific strength-to-weight ratio above this limit has not been generally accepted by the automotive industry.

[12] The Court clarifies that there is a distinction between Bloch failing to conduct testing to determine whether alternative designs for the Silverado were feasible versus failing to conduct testing to determine whether these alternative designs would have prevented Polk's injuries. As to the former, no testing was required because Bloch analyzed the designs that were being implemented across the automotive industry. As to the latter, however, there is no accepted standard for what strength-to-weight ratio is sufficient to prevent match-boxing. As such, Bloch was required to proffer some evidence that his alternative designs actually would have prevented Polk's injuries. Bloch has failed to do so, and has instead supplied the Court with a bare conclusion devoid of any factual support.

As to reliance on the Obergefell Tests, the Court finds this to be equally insufficient. The Obergefell Tests were used to "correlate[] the extent of roof crush with the X/Y/Z-axis loads (and injury risk) onto the instrumented dummies." Bloch Affidavit at 11. Based upon the Obergefell Test's findings, Bloch concludes that "if you reduce the extent of roof deformation or roof crush, you reduce the forces experienced by the lumbar spine whether it's a test dummy or whether it's Miranda Polk." Bloch Deposition at 160. As GM notes, however, "[t]his analysis is question-begging. Even if Mr. Bloch's premise is true—roof crush correlates with force on an occupant—Mr. Bloch's conclusion relies on an additional step: that his design changes would reduce roof crush." Motion to Exclude at 13. Bloch provides no evidence, outside of his bare conclusions, to show that he reached this "next step" with any reliable methodology. In fact, the Obergefell Tests do not show at what strength-to-weight ratio a vehicle's roof will no longer experience deformation, just that there is a correlation between the two. For these reasons, the Court finds that even if Bloch were qualified to opine on whether his alternative designs for the Silverado would have prevented Polk's injuries, his methodology for reaching an opinion on this issue is unreliable. Accordingly, the Court will exclude Bloch's testimony that his alternative design would have prevented Polk's injuries.

In sum, the Court finds that Bloch's methodology for determining that the Silverado was defectively designed and that alternative designs for the Silverado were feasible is sufficiently reliable. However, Bloch's opinion that these alternative designs would have prevented Polk's injuries is unreliable, and such testimony will be excluded.

### 3.    Whether Bloch's Testimony Will Aid the Jury

GM also contends that Bloch's testimony will not be helpful to the jury because he proffers a "safest possible product" opinion that is not cognizable under Florida law. Motion to Exclude at 18. Specifically, GM argues that rather than basing his opinion on whether the Silverado was in-fact defective, Bloch's opinion is "based on what he perceives [to be] the safest possible product." Id. Consequently, GM asserts that Bloch's testimony is irrelevant, and will not be helpful to the jury. Id. This argument is unavailing. Under Federal Rule of Evidence 702(a), an expert's testimony must "help the trier of fact to understand the evidence or to determine a fact in issue[.]" Id. Therefore, a proffering party must show that the expert's testimony will be helpful "to the factfinder in understanding the evidence or determining a fact, by a preponderance of the evidence." Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp., 582 F.3d 1227, 1232 (11th Cir. 2009) (citing Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005)).

Here, a key element of Polk's case is her contention that the Silverado was defectively designed. Notably, this element "must be proven by expert testimony." Alvarez v. Gen. Wire Spring Co., No. 8:07-CV-1319-T-33TGW, 2009 WL 248264, at *4 (M.D. Fla. Feb. 1, 2009) (citation omitted). Therefore, it is hard to see how Bloch's testimony would be irrelevant, as his opinion is necessary for Polk to be able to sustain her claim. As to GM's argument that Bloch is offering a "safest possible product" opinion, the Court is not convinced that this is a proper characterization of Bloch's testimony. Notably, "a manufacturer is, as a matter of law, under no duty to produce a fail-safe product, so long as the product poses no unreasonable dangers for consumer use." Hernandez v. Altec Env't Prod., LLC, 903 F. Supp. 2d 1350, 1359 (S.D. Fla. 2012) (citation omitted). At this juncture, it does not appear that Bloch is offering an opinion that the Silverado should have been designed to be "fail-safe," but instead, that the Silverado was unreasonably dangerous for consumer use. In fact, Bloch opined that GM should have informed consumers that "if you buy this Silverado pickup, the strength to weight ratio is 2.0, but if you go over to Toyota, you can get a Toyota Tundra that's at 5.0, which is a much stronger roof to protect you and your family if there's a rollover accident." Bloch Deposition at 26. To the extent Bloch is offering a "safest possible product" opinion, the Court has already determined that Bloch cannot testify that his alternative designs would have prevented Polk's injuries. Therefore, the Court

finds that Bloch's testimony, as limited in this Order, is relevant and that it will aid the jury in deciding the facts of this case. See Fed. R. Evid. 702(a).

In sum, the Court finds that Bloch may testify as to whether the Silverado's roof was defective and whether alternative designs for the Silverado were feasible. Bloch may not testify, however, as to medical causation or biomechanics because he is not qualified to do so. And he will not be permitted to testify as to whether his alternative designs, if implemented, would have prevented Polk's injuries because he failed to use a reliable methodology to reach his conclusion. Accordingly, the Court will grant in-part and deny in-part GM's Motion to Exclude (Doc. 73). Having resolved these evidentiary issues the Court now addresses GM's Motion for Summary Judgment.

### B.   Motion for Summary Judgment

Polk has brought two claims against GM for (1) product liability and (2) negligence on the basis of her contention that GM defectively designed the Silverado and the defective design caused her injuries. Amended Complaint at 3–5. When exercising diversity jurisdiction, as is the case here, the Court "must apply substantive state law." Bravo v. United States, 577 F.3d 1324, 1325 (11th Cir. 2009) (per curiam). As to the first claim, under Florida law, to sustain a claim for product liability a plaintiff must "prove that (1) a product (2) produced by a manufacturer (3) was defective or created an unreasonably dangerous condition (4) that proximately caused (5) injury." Edward M. Chadbourne, Inc.

v. Vaughn, 491 So. 2d 551, 553 (Fla. 1986). As to the negligence claim, a plaintiff must "allege the existence of a duty, breach of that duty, causation, and damages." Horton v. Freeman, 917 So. 2d 1064, 1066 (Fla. 4th DCA 2006) (citing Clay Elec. Co-op., Inc. v. Johnson, 873 So. 2d 1182 (Fla. 2003)). Notably, under Florida law, for "claims in negligence and strict liability, a plaintiff must first prove that the product was defective." O'Bryan v. Ford Motor Co., 18 F. Supp. 3d 1361, 1366 (S.D. Fla. 2014) (citing Diversified Products Corp. v. Faxon, 514 So. 2d 1161 (Fla. 1st DCA 1987)). This is so because "proof of a defect determines a breach of duty under a negligence theory and the presence of an unreasonably dangerous condition under a strict liability theory." Id. The "burden to show that a defective design exists is on the plaintiff." Farias v. Mr. Heater, Inc., 757 F. Supp. 2d 1284, 1293 (S.D. Fla. 2010) (citing Husky Indus., Inc. v. Black, 434 So. 2d 988, 991 (Fla. 4th DCA. 1983)).

Here, GM contends that it is entitled to summary judgment on Polk's product liability and negligence claims because she cannot prove that the Silverado was defective or that it was the cause of her injuries. Motion for Summary Judgment at 11. In the alternative, GM argues that it is entitled to entry of final judgment as a result of Polk's spoliation of evidence. Id. at 16. The Court will address each argument in turn.

### 1.   Defect

GM contends that Polk has failed to provide evidence that the Silverado was defective. Motion for Summary Judgment at 11. Before turning to the merits of this contention, the Court notes that the definition of design defect is in a "state of flux in Florida." In re Standard Jury Instructions in Civil Cases–Report No. 09–10 (Prods. Liab.), 91 So.3d 785, 789 (Fla. 2012) (Pariente, J., concurring). Currently, the Florida pattern jury instruction on design defect instructs that: "A product is unreasonably dangerous because of its design if [the product fails to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the manufacturer] [or] [the risk of danger in the design outweighs the benefits]." See Florida Standard Jury Instructions in Civil Cases–PL 5 (emphasis added). Courts refer to the first parenthetical as the "consumer-expectation test" and the second parenthetical as the "risk-utility test." Force v. Ford Motor Co., 879 So. 2d 103, 105 (Fla. 5th DCA 2004). Because Polk alleges that the "defective condition of the Silverado . . . rendered it more dangerous than an ordinary consumer would expect[,]" the Court will analyze her claims primarily under the ordinary consumer test. Amended Complaint at 4. Regardless of the test used, however, a design defect "must be proven by expert testimony." Alvarez, 2009 WL 248264, at *4 (citation omitted).

Here, Polk has asserted three separate theories as to why the Silverado was defective: (1) the "handling and stability" and "high center of gravity" of the Silverado made it prone to rolling over; (2) the headlights of the Silverado provided low illumination causing Colley to suddenly swerve and lose control of the vehicle; and (3) the Silverado's design made it susceptible to match-boxing. Amended Complaint at 3–4. GM argues that Polk has failed to provide expert testimony sufficient to establish her first and third defect theories, and that her second defect theory—insufficient headlights—was never pled in this case. As to Polk's first two theories GM is correct, but as to the third, GM is incorrect.

a.  The Silverado's Handling and High Center of Gravity

In her Amended Complaint, Polk alleges that the Silverado "had a high center of gravity that caused handling and stability problems which made it likely to overturn during emergency maneuvers." Amended Complaint at 3. However, Polk has failed to provide any expert testimony in support of this contention. See Alvarez, 2009 WL 248264, at *4. As Polk's defect expert (Bloch) has explained, he was not retained to analyze whether the Silverado had a high center of gravity:

> **Q:** Where in your three reports do you talk about the static stability factor or rollover propensity of the Chevy Silverado?
>
> **A:** I don't because that was not part of what I was initially assigned by counsel.
> . . .

**Q:** So as you sit here right now, you do not have an opinion that you intend to offer relative to the static stability factor or rollover propensity of the Chevy Silverado, correct?

**A:** At the moment, that's correct, unless, you know, asked by counsel to also do a supplemental analysis and then of course I would do a report and possibly one or two or three exhibit boards to show what the static stability factor is and pickup trucks do have a lower stability factor just generically and then, you know, I would then get into the particulars of the particular Silverado, you know, regular cab, standard cab, a pickup in this case, et cetera.

Bloch Deposition at 74–75. Because Bloch will not be testifying that the Silverado was defective due to its high center of gravity—and because Polk has not disclosed another expert that will testify as to this issue—the Court finds that Polk has failed to proffer evidence sufficient to establish this defect theory. Accordingly, GM is entitled to summary judgment on this portion of Polk's claim. See Shiver v. Chertoff, 549 F.3d 1342, 1343–44 (11th Cir. 2008) (noting that Rule 56 "mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case") (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

b.  The Silverado's Headlights

As to the Silverado's headlights, GM asserts that Polk never pled the inadequacy of the headlights in her Amended Complaint, and that Bloch cannot raise this theory on her behalf for the first time in his expert report. Motion for Summary Judgment at 12. The Court finds this argument to be persuasive as

well. Generally, a plaintiff may not "raise new claims at the summary judgment stage." Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314 (11th Cir. 2004). Instead, the "proper procedure for [a plaintiff] to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a)." Id. at 1315. Here, Polk made no mention of the theory that the Silverado's headlights were defective in the Amended Complaint. Instead, Bloch raised the issue for the first time in his expert report. Bloch Expert Report at 29. Moreover, Polk failed to respond to GM's arguments on this issue. On this record, the Court finds that GM is entitled to summary judgment on Polk's purported claim that the Silverado's headlights were defective.

c.  The Silverado's Susceptibility to Match-Boxing

GM argues that it is entitled to summary judgment on Polk's roof-strength theory because Bloch is unable to provide expert testimony on whether the Silverado was defective. Motion for Summary Judgment at 12.[13] This

---

[13] Polk contends that Captain Matt Barr provides sufficient testimony to support a finding that the Silverado's roof was defective. Response to Motion for Summary Judgment at 9. Captain Barr was one of the first responders to arrive at the scene of Polk's accident, and opined that based on his experience the Silverado's roof was weaker than other vehicles manufactured at the time. Barr Deposition at 82. The Court declines to consider Captain Barr's testimony in resolving the Motion for Summary Judgment. A defect must be proven through expert testimony. See Alvarez, 2009 WL 248264 at *4. Although Polk has proffered that Captain Barr has extensive experience in vehicle machinery and advanced extraction, Captain Barr was never disclosed as an expert in this case. See generally Plaintiff Miranda Polk's Expert Witness Disclosure (Doc. 69-10). Accordingly, the Court will base its decision on whether Polk has met her burden of establishing that the Silverado was defective solely on the expert testimony and opinion of Bloch.

argument is predicated on GM's contention that its Motion to Exclude should be granted, and Bloch should be barred from testifying. However, the Court has found that Bloch may testify as to his opinion that the Silverado was defectively designed. Therefore, the Court finds that Polk has provided the requisite expert testimony needed to support this defect theory. Alvarez, 2009 WL 248264, at *4 (the existence of a defect "must be proven by expert testimony"). Accordingly, GM is not entitled to summary judgment on Polk's claim that the Silverado's roof was defective because it was susceptible to match-boxing.

In sum, the Court finds that summary judgment is due to be granted in favor of GM on Polk's claims that the Silverado was defective due to its high center of gravity and the low illumination of its headlights. However, summary judgment is due to be denied as to Polk's claim that the Silverado was defective due to its roof being susceptible to match-boxing.

## 2. Causation

GM next argues that Polk lacks any evidence that the alleged defects in the Silverado were the cause of her injuries. Motion for Summary Judgment at 13. Specifically, GM explains that Polk's expert witness, Dr. Boehme, is of the opinion that Polk would have been injured even if the roof did not match-box because she was not wearing a seatbelt at the time of the accident. Id. Similar to proving that a product was defective, "in cases where a jury is asked to assess complex medical or scientific issues outside the scope of a layperson's

knowledge, an expert's testimony is required." <u>McCasland v. Pro Guard Coatings, Inc.</u>, 799 F. App'x 731, 733 (11th Cir. 2020) (citing <u>Chapman v. Procter & Gamble Distrib., LLC</u>, 766 F.3d 1296, 1316 (11th Cir. 2014)). Moreover, in establishing causation a "plaintiff must show that the injury <u>more likely than not</u> resulted from the defendant's negligence in order to establish a jury question of proximate cause." <u>R.J. Reynolds Tobacco Co. v. Nelson</u>, 353 So. 3d 87, 90 (Fla. 1st DCA 2022) (quoting <u>Gooding v. Univ. Hosp. Bldg., Inc.</u>, 445 So. 2d 1015, 1020 (Fla. 1984)).

Here, the parties dispute the characterization of Dr. Boehme's testimony, and whether it supports a conclusion that the Silverado's allegedly defective roof was the cause of Polk's injuries. GM contends that Dr. Boehme opined that because Polk was not wearing a seatbelt, "she would have suffered the same injury" regardless of whether the Silverado's roof match-boxed. Motion for Summary Judgment at 8 (quotation omitted). In support of this position, GM relies in-part upon the following excerpts from Dr. Boehme's deposition:

> **Q:** Are you able to state within a reasonable degree of engineering certainty or probability that if there had not been deformation to the roof, that Ms. Polk's outcome would have been different given that she was unrestrained?

> **A:** Oh, very good question. The -- I can tell you that she would have been subjected to the same force application because she would have struck the roof since she was unrestrained. Now, whether or not she would have gotten the same injury pattern that

we see in the medical records now, I mean, that is possible because the same force application was responsible for the injury pattern that we see in the medical records. The fact that her head was shifted to the side, as I previously described, the radial acceleration drives her to the roof, and then when the truck falls, you know, two feet for every rotation, so you have to add that. So the same force application is going to strike there. So from a theoretical standpoint, with the same force application and her same positioning, <u>I would expect the same injury pattern had the roof remained intact because she was unrestrained</u>. Do you see what I'm saying?

. . .

**Q:** So if you build a -- I'm just trying to understand. If you build a motor vehicle roof that did not deform or crush, but you have an occupant in this same scenario -- so you have a roof that doesn't deform, doesn't bend, doesn't crush, and you have an unbelted occupant in this scenario, do you still have the same force and application and the same risk of injury?

**A:** Well, the risk of injury, as we alluded to before -- the same force application applies. She's going to hit her head . . . So I would say that she would have suffered -- she would have experienced the same force application. And since she experienced the injury from that force application based on that principal direction of force, <u>it would be likely, within a reasonable degree of medical and engineering probability, that she would have suffered the same injury</u>

Boehme Deposition at 39–40; 58–59 (emphasis added).

Polk contends that this isolated passage is a mischaracterization of Dr. Boehme's testimony, as he was merely responding to a hypothetical "which was premised on the assumption [that Polk's] position would remain the same in the vehicle during the rollover accident." Response to Motion for Summary Judgment at 17. Polk argues that Dr. Boehme's testimony, contextualized, more

accurately supports the notion that the Silverado's roof was the cause of her injuries. Specifically, Polk points to Dr. Boehme's statements that due to the distance between Polk's body and the depth of the roof's match-boxing, she would have been injured by the roof even if she had been wearing a seatbelt:

> **Q:** What I'm trying to understand, I thought we had talked about earlier that, as an unrestrained occupant, the potential -- it would exist for her to suffer the same force and direction, even if the roof did not collapse, because of her being unrestrained?
>
> **A:** That is correct. Absolutely correct.
>
> **Q:** And so I'm trying to figure that out in comparison to the -
>
> **A:** Bob, let me just make it -- basically, if her head and torso or upper torso strikes that roof in this condition, the same roll rate -- I mean, we have to assume the same accident conditions, if you will. Under those conditions, if her head and upper torso strikes that roof because she was wearing a seatbelt, the roof came down to her or whatever, she's going to experience the same force application. The only time that she doesn't is if she is wearing a seatbelt and the roof doesn't make contact with her head or upper torso. You see what I'm saying?
>
> **Q:** (Nods head.)
>
> **A:** So it's a binary decision, if you will. So if the roof doesn't make contact with her head for whatever reason, then the force application is going to be different. And it's going to be much less, especially if she's wearing the seatbelt. But if the -- <u>but based on the measurements, had she been wearing the seatbelt, there was enough intrusion that she would have made contact with the roof.</u> So the same force -- the same physics applies.

Boehme Deposition at 55–57 (emphasis added).

Although Dr. Boehme's statements are arguably in tension with one another, at this stage of the proceedings the Court is required to read Dr. Boehme's testimony in the light most favorable to Polk. <u>See</u> <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (citation omitted) (at summary judgment "all inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party"). Viewing Dr. Boehme's testimony in this light, the Court finds that Polk has provided the requisite expert testimony needed to raise a jury question as to her claim that the Silverado's alleged roof failure caused her injuries.

The Court notes that Dr. Boehme submitted an affidavit after his deposition clarifying the alleged inconsistency in his testimony. In this affidavit, Dr. Boehme stated that he was merely responding to a hypothetical posed by GM's counsel:

> [R]egarding whether Miranda Polk would have suffered the same injury had the roof not 'caved in,' as set forth on pages 58 and 59 of my deposition transcript, such opinion was rendered with the assumption that the occupant remained in the same position.

<u>See</u> Affidavit of Richard Boehme, MD at 1–2 (Doc. 76-15). To the extent that GM believes that Dr. Boehme's testimony is inconsistent—and that his affidavit insufficiently rectifies this inconsistency—GM is free to make this point during cross-examination. However, at this juncture, the Court finds that there is sufficient evidence in the record to create a jury question on Polk's claim that

the Silverado's alleged defects were the cause of her injuries. Accordingly, the Court finds that GM's Motion for Final Summary Judgment as to all of Polk's claims is due to be denied.

### 3.    Spoliation Sanctions

GM also contends that it is entitled to the entry of final judgment as a sanction for Polk's spoliation of evidence. Motion for Summary Judgment at 15. Specifically, GM argues that entry of final judgment is warranted because Polk (1) spoliated the Silverado when it was sold to a third-party before GM had a chance to inspect it and (2) her attorneys authorized the destruction of evidence that was obtained during Yates' inspection of the Silverado. Id. at 15–16. "Spoliation is 'defined as the destruction of evidence or the significant and meaningful alteration of a document or instrument.'" Tesoriero v. Carnival Corp., 965 F.3d 1170, 1184 (11th Cir. 2020) (quoting Green Leaf Nursery v. E.I. DuPont De Nemours & Co., 341 F.3d 1292, 1308 (11th Cir. 2003)). "Sanctions for spoliation of evidence include '(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator.'" Oil Equip. Co. Inc. v. Mod. Welding Co. Inc., 661 F. App'x 646, 652–53 (11th Cir. 2016) (quoting Flury v. Daimler Chrysler Corp., 427 F.3d 939, 945 (11th Cir. 2005)). The test applied to determine whether spoliation sanctions are warranted depends on whether the evidence at issue is tangible or electronically stored. As to the spoliation of

tangible evidence, sanctions constitute an evidentiary matter, and "federal law governs the imposition of sanctions for failure to preserve evidence in a diversity suit." Flury, 427 F.3d at 944. "Although federal law controls spoliation sanctions, the Eleventh Circuit has not set forth specific guidelines on the imposition of such sanctions." Se. Mech. Servs., Inc. v. Brody, 657 F. Supp. 2d 1293, 1299 (M.D. Fla. 2009). Consequently, the Court looks to Florida law to the extent that it is consistent with federal law. Id. Under Florida law, "spoliation is established when the party seeking sanctions proves that: (1) the evidence existed at one time, (2) the alleged spoliator had a duty to preserve the evidence, and (3) the evidence was crucial to the movant's prima facie case or defense." Id. (quoting Golden Yachts, Inc. v. Hall, 920 So. 2d 777, 781 (Fla. 4th DCA 2006)).

As to the spoliation of electronically stored information, the Court applies Federal Rule of Civil Procedure 37(e). See Staple v. Nw. Mut. Life Ins. Co., No. 8:17-CV-3066-T-35TGW, 2020 WL 11272799, at *2 (M.D. Fla. Sept. 30, 2020) (citation omitted) ("While sanctions for spoliation of ESI are available only under Rule 37(e), sanctions for spoliation of tangible evidence can be imposed pursuant to the Court's inherent authority."). To impose sanctions under Rule 37(e), the Court must make the following findings:

> e) If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because

a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

> (A) presume that the lost information was unfavorable to the party;

> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

> (C) dismiss the action or enter a default judgment.

Id.

Under either test, "this circuit does not require a showing of malice in order to find bad faith[.]" Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1310 (11th Cir. 2009). Nevertheless, "mere negligence in losing or destroying records is not sufficient to draw an adverse inference." Id; see also Skanska USA Civ. Se. Inc. v. Bagelheads, Inc., 75 F.4th 1290, 1312 (11th Cir. 2023) (quoting Fed. R. Civ. Pro. 37(e)(2)) ("'[I]ntent to deprive another party of the information's use in the litigation' is the equivalent of bad faith in other spoliation contexts.")). As this case involves the spoliation of both tangible evidence, and evidence that was electronically stored, the Court will analyze each piece of evidence in accordance with the applicable test.

a.  <u>Spoliation of the Silverado</u>

GM argues that it is entitled to an entry of final judgment because Polk allowed the Silverado to be sold to a third-party before it had a chance to inspect it. Motion for Summary Judgment at 16. As noted earlier, Polk did not own the Silverado, rather, Colley owned it. After the accident, the Silverado was taken to Copart, and its title was transferred to State Farm. Copart's Response at 30. Polk's attorneys sent State Farm and Copart a letter instructing that the vehicle be preserved. Request for Hold at 2. Unbeknownst to Polk, however, a State Farm representative released the hold on the Silverado and Copart sold it to a third-party in the country of Jordan. Copart's Response at 21. Before Copart sold the Silverado, Polk's attorneys, and her expert witnesses, were able to inspect the vehicle. <u>Id.</u> at 22. As this litigation had not yet commenced, and GM did not have notice of Polk's claims, GM never had an opportunity to inspect the Silverado.

Polk does not contest that the Silverado existed, and that she had a duty to preserve it. However, she contends that GM has not been prejudiced by the spoliation of the Silverado, and that she did not act in bad faith. Response to Motion for Summary Judgment at 18–19. The Court rejects Polk's contention that GM has not been prejudiced by the spoliation of the Silverado. But her argument that neither she nor her attorneys acted in bad faith fairs better. In addressing these issues, the Court finds the Eleventh Circuit's opinion in <u>Flury</u>

v. Daimler Chrysler Corp. to be instructive. There, the plaintiff sold the subject vehicle for salvage before the defendant had a chance to inspect it. Id. at 942. The Eleventh Circuit found that "direct examination of the vehicle's condition was critically important to [the] case." Id. at 946. And that the "resulting prejudice to defendant [was] incurable by any sanction other than dismissal." Id. at 947. Here, the Silverado is similarly important to Polk's case, and GM's inability to inspect the vehicle impacts its ability to defend against Polk's claims. Nevertheless, the Court does not find that entry of final judgment is warranted. Notably, the reason the Flury court ordered final judgment in the defendant's favor was its determination that the plaintiff had acted in bad faith in spoliating the vehicle. Specifically, the plaintiff knew that the defendant wished to inspect the vehicle, ignored the defendant's requests to conduct an inspection, and ultimately sold the car without notifying the defendant. The court explained:

> The record reveals that plaintiff knew the location and condition of the subject vehicle for a considerable amount of time following the accident. Moreover, plaintiff was fully aware that defendant wished to examine the vehicle. Knowing this, plaintiff ignored defendant's request and allowed the vehicle to be sold for salvage without notification to defendant of its planned removal. Even absent defendant's unambiguous request for its location, plaintiff should have known that the vehicle, which was the very subject of his lawsuit, needed to be preserved and examined as evidence central to his case. Plaintiff's failure to preserve the vehicle resulted in extreme prejudice to the defendant, and failure to respond to defendant's letter displayed a clear dereliction of duty.

Id. at 944–45.

Here, Polk's attorneys sent Copart and State Farm a letter instructing that the Silverado be preserved indefinitely. Although the vehicle was ultimately sold, it was not sold at Polk's direction, nor was it sold with her knowledge. Therefore, Polk's failure to ensure that the vehicle was preserved could be negligent, but nothing more. And "[m]ere negligence in losing or destroying [evidence] is not enough for an adverse inference, as it does not sustain an inference of consciousness of a weak case." Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997) (quotations omitted). For this reason, the Court finds that although GM has been prejudiced by the spoliation of the Silverado, Polk did not act in bad faith, and the imposition of sanctions is therefore not warranted.

b. Spoliation of Evidence Obtained During Yates' Inspection of the Silverado

GM next argues that it is entitled to the entry of judgment because the photographs, measurements, and SDM data obtained from the Silverado during Yates' inspection of the vehicle were destroyed. Motion for Summary Judgment at 16. As discussed earlier, Polk retained Yates to be her expert witness and to offer an opinion as to whether the Silverado was defectively designed. Yates inspected the Silverado in January of 2017, and during his inspection took photos of the vehicle, obtained measurements from it, and retrieved data from the vehicle's SDM. In December of 2021, Polk moved to replace Yates with

Bloch, which the Court allowed, and Polk's attorneys notified Yates that he would no longer be working on the case and that he could close his file. Yates Deposition at 27. Yates' firm (BEC Consulting) later destroyed the photos, measurements, and SDM data that was in its possession. Id. at 27–28. For the reasons discussed below, the Court finds that the imposition of sanctions is not warranted for the spoliation of the photographs and measurements, but that sanctions are appropriate for the spoliation of the SDM data.

As to the photographs and measurements taken by Yates, neither party addresses whether this material, when destroyed, was in electronic format. Regardless, the Court finds that under both Florida law and Rule 37(e) the imposition of sanctions is not warranted. The record shows that Polk has provided GM with the photographs and measurements that Dr. Boehme took during his inspection of the Silverado. See Affidavit of Thomas T. Demas at 2 (Doc. 76-5). Rule 37(e) provides for sanctions when "information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery[.]" Id. (emphasis added). GM fails to explain how it has been prejudiced by the destruction of the photographs and measurements taken by Yates when Polk also does not have access to that information and has provided GM with materially similar evidence from Dr. Boehme. For this reason, the Court finds that GM has failed to show that the

spoliation of this evidence has impacted its ability to defend against Polk's claims. Accordingly, the Court will not impose sanctions for the spoliation of the photographs and measurements that were in Yates' possession.

Turning to the SDM data, the Court finds that the spoliation of this evidence has prejudiced GM. See Fed. R. Civ. Pro. 37(e)(1). The Silverado's SDM would have recorded information regarding the speed of the Silverado prior to the accident, the vehicle's change in velocity during the accident, the vehicle's roll rate data, and other technical information. Yates Deposition at 30–31. Since the Silverado has been sold, it is impossible for the SDM and its data to be recovered. This has prejudiced GM. For example, Polk proffers that eyewitness testimony will establish that prior to the accident the Silverado appeared to be going "45 miles per hour" when it suddenly made an "evasive maneuver . . . as if there was something in the road ahead," and that the Silverado then "started rolling passenger side first." Response to Motion for Summary Judgment at 19. As GM notes, it is now reliant at trial upon "the fading memories of eyewitnesses (the crash occurred seven years ago) as unchallenged fact[.]" Reply at 7. The SDM's data, however, would have allowed GM to properly test the veracity of Polk's proffered eyewitness testimony. And would have allowed GM to defend against Polk's claims more fully by providing electronically stored data regarding the manner in which the accident occurred. This is especially true considering that Bloch and GM's expert, Anthony Melocchi, dispute the

severity of the accident. <u>See</u> Bloch Expert Report at 3 ("This was a moderate rollover, not 'a severe crash' as GM's Anthony Melocchi claims in his June 20121 [sic] report.").

As GM has been prejudiced by the spoliation of the SDM data, the Court must next determine whether Polk or her attorneys acted in bad faith in spoliating this evidence. <u>See</u> Fed. R. Civ. Pro. 37(e)(2). "Spoliation sanctions— and in particular adverse inferences—cannot be imposed for negligently losing or destroying evidence. Indeed, 'an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith.'" <u>Tesoriero</u>, 965 F.3d at 1184 (quoting <u>Bashir</u>, 119 F.3d at 931). Bad faith can be established through either "direct or circumstantial evidence." <u>In Matter of Complaint of Bos. Boat III, L.L.C.</u>, 310 F.R.D. 510, 520 (S.D. Fla. 2015) (citation omitted). GM does not contend that there is direct evidence of bad faith, therefore, the Court must determine whether the circumstantial evidence supports a finding of bad faith. Motion for Summary Judgment at 17. To prove bad faith by circumstantial evidence a party must establish the following four elements:

> (1) [E]vidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

Bos. Boat III, 310 F.R.D. at 520 (collecting cases).

The Court is of the view that oral argument will aid in the resolution of this issue. As such, the Court will take the Motion for Summary Judgment under advisement to the extent GM seeks entry of a sanction for the spoliation of the SDM data. The parties will be directed to address this issue at the pre-trial conference. Notably, even if neither Polk nor her attorneys acted in bad faith in spoliating the SDM data they "failed to take reasonable steps to preserve" this information. Fed. R. Civ. Pro. 37(e). And this failure has prejudiced GM. As such, some sanction or curative measure is warranted. Id. ("[U]pon finding prejudice to another party from loss of the information, [the court] may order measures no greater than necessary to cure the prejudice[.]"). However, neither party has addressed the question of what would be an appropriate measure to cure the prejudice to GM, if GM fails to show bad faith. Thus, the parties should be prepared to address this question at the pre-trial conference as well.

## IV.    Conclusion

Upon consideration of the record and the parties' arguments, GM's Motion to Exclude and Motion for Summary Judgment are granted in-part, denied in-part, and taken under advisement in-part. As to the Motion to Exclude, Bloch will be allowed to testify at trial about whether the Silverado

was defective and whether alternative designs for the Silverado were feasible. However, Bloch will not be allowed to testify that his alternative designs would have prevented Polk's injuries. Nor may he testify as to medical causation and biomechanics.

As to GM's Motion for Summary Judgment, GM is entitled to summary judgment on Polk's claim that the Silverado was defective due to its high center of gravity, and on Polk's claim that the Silverado's headlights were defective. GM is not entitled to summary judgment, however, on Polk's claim that the Silverado's roof was defectively designed. Additionally, the imposition of sanctions is not warranted for the spoliation of the Silverado, nor for the spoliation of the photographs and measurements taken by Yates. GM's Motion for Summary Judgment is taken under advisement as to the request for the imposition of sanctions for the spoliation of the SDM data. The parties will be directed to address this remaining issue at the pre-trial conference.

Accordingly, it is

**ORDERED:**

1.   Defendant General Motors LLC's Supplemental Motion to Exclude (Doc. 73) is **GRANTED in-part and DENIED in-part**. The Motion is **GRANTED** to the extent set forth in the body of this Order, and otherwise **DENIED**.

2.    Defendant General Motors LLC's Motion for Summary Judgment and Spoliation Sanctions (Doc. 69) is **GRANTED in-part, DENIED in-part**, and **taken under advisement in-part**. The Motion is **GRANTED** to the extent set forth in the body of this Order, taken under advisement to the extent GM seeks a sanction for the spoliation of the SDM data, and otherwise **DENIED**.

3.    At the pre-trial conference, the parties must be prepared to address:

a.  whether Polk's attorneys acted in bad faith; and

b.  what sanction or remedy is appropriate for the spoliation or failure to preserve the SDM data.

**DONE AND ORDERED** in Jacksonville, Florida this 29th day of January, 2024.

**MARCIA MORALES HOWARD**
United States District Judge

Lc32
Copies to:

Counsel of Record